Rodney L. PHILLIPS, Plaintiff
and Respondent,

v.

JCM DEVELOPMENT CORPORATION, a Utah corporation; James C. McGarry, Jr.; Linda McGarry; James R. Glavas, dba J.G. Realty; James Gleason; Robert G. Anderson; United Farm Agency, Inc., a Utah corporation; Clan Stilson and Does I through XV, Defendants and Appellants.

No. 18211.

Supreme Court of Utah.

June 9, 1983.

Jackson Howard, Richard B. Johnson, Provo, Brad Holm, Salt Lake City, Harry E.

Snow, Moab, Harold R. Stephens, Salt Lake City, for defendants and appellants.

Paul W. Mortensen, Moab, for plaintiff and respondent.

HALL, Chief Justice:

Plaintiff Rodney L. Phillips initiated this action against defendants to recover damages arising out of a real estate transaction. The district court entered judgment in the amount of $185,178.30 against all named defendants, jointly and severally, except Linda McGarry. Only defendant United Farm Agency, Inc. (hereinafter UFA) appeals, seeking reversal or, in the alternative, that the case be remanded for further hearing. The appeal rests upon four points of contention: (1) there was insufficient evidence introduced at trial on which to base a verdict against defendant UFA; (2) an individual cannot maintain an action in his or her name for wrongs done by third parties to a corporation with which the individual is associated; (3) the portion of the judgment which refers to the defendant's obligation to assume corporate liabilities of Phillips Construction Company is void as a matter of law in violation of the statute of frauds; and (4) there is insufficient evidence in the record to sustain a judgment against defendant Robert Anderson (hereinafter Anderson) for breach of duties owed to the plaintiff. We affirm.

Plaintiff owned several parcels of real property in Moab, Utah, including a motel, an office building, a house and a construction business. In June, 1977, plaintiff listed the motel and office building with UFA, a corporation engaged as a real estate broker,[1] through UFA's local agent, Anderson. Anderson sold these two properties in May, 1978, at the listed price of $200,000, and UFA received a $20,000 commission, $10,000 of which went to Anderson.

In the meantime, back in January, 1978, plaintiff had also listed his house and construction company with UFA through Anderson, for a combined sale price of $275,-000. A buyer for the house was procured through UFA's national listing catalogue and the closing occurred in June, 1978. The house sold for $75,000, and again UFA received a commission, which it split evenly with its agent, Anderson.

Plaintiff's construction business was relisted with UFA in June, 1978, at a sale price of $185,000. At the time it was relisted, plaintiff advised Anderson that he was having cash flow problems and that a prospective buyer should have $50,000 cash available to meet the monthly cash turnover.

On July 17, 1978, defendant JCM Development Corporation was presented by Anderson as a prospective purchaser of plaintiff's construction company. Defendant James C. McGarry, president of JCM, and his realtor, defendant James Gleason, an agent for defendant J.G. Realty, were introduced to plaintiff as representatives of the purchasing corporation. Anderson, McGarry and Gleason spent the afternoon of July 17 looking at some of the company's projects and equipment, meeting employees and reviewing the company's business records. Also on that date, plaintiff inquired as to whether JCM had the $50,000 liquidity necessary to maintain the company's operations and was assured by Anderson that "money was no problem with these people," and further, that they were worth millions of dollars.

The next day, July 18, the parties met again at plaintiff's office, where they reviewed additional business documents, examined equipment and negotiated a possible sale. In these sale negotiations, which continued on and off throughout most of the day, Anderson, in his capacity as plaintiff's realtor, represented plaintiff's interests and negotiated on his behalf. In the early evening, Anderson informed plaintiff that McGarry and Gleason were satisfied with the information they had seen and were ready to make a deal. To this end, a

---

1. Under Utah law, a corporation that engages in the sale of real estate for a fee is a "real estate broker." U.C.A., 1953, § 61–2–2.

meeting was held at Anderson's office with Anderson, McGarry, Gleason and plaintiff present.

An agreement was reached whereby plaintiff would receive $200,000 for the sale of the construction company and an adjoining 1.7-acre lot. An earnest money agreement was signed by McGarry and plaintiff which provided for the payment of the purchase price as follows: $40,000 cash down; a five-year 10 percent note for $38,750; the balance to be paid by JCM's assuming existing loans on the company, building and equipment in the amount of $121,250. The terms of this agreement did not include plaintiff's (the construction company's) accounts receivable or payable.

Although the terms of the earnest money agreement as set forth above are not in dispute, the involvement of UFA and its agent, Anderson, in the preparation of the agreement is in dispute. Anderson claims that he did not participate in the drafting of the earnest money agreement. He testified that at the meeting in his office on the evening of July 18, Gleason suggested that the sale be transacted by means of a simple stock transfer and a bill of sale, and that he (Anderson) objected to that method of sale, advising all present, including plaintiff, that such method would not be in compliance with the Bulk Sales Act. He further testified that after he had protested the proposed method of transacting the sale, Gleason told him to "step aside" and let him (Gleason) handle the deal. He asserted that he did step aside at that point and that plaintiff's subsequent acceptance of Gleason's stock transfer terms and his signing of an earnest money agreement on J.G. Realty forms evidenced plaintiff's understanding that Anderson was no longer representing him in the transaction.

Plaintiff's evidence regarding Anderson's involvement in the earnest money agreement differs significantly. Plaintiff's evidence showed that Anderson's objection and advice with respect to the method of transacting the sale were given to Gleason in private, rather than openly in the hearing of plaintiff, and that Anderson's stepping aside to allow Gleason to conduct the earnest money portion of the sale was not meant as a token of his withdrawal from the transaction or from representing plaintiff, but rather was done to protect his and his employer's (UFA's) own private interests.[2]

Plaintiff's evidence also showed that the decision to use a J.G. Realty earnest money agreement form was made by Anderson and Gleason privately and that no explanation therefor was offered to plaintiff. Plaintiff testified that when he did ask for an explanation Anderson answered that there was to be a commission split between the brokers (presumably J.G. Realty and UFA), and that he would receive $5,000 of the $20,000 commission.

During the negotiations for the sale, McGarry and Gleason had asked Anderson for a financial statement on plaintiff. Plaintiff in turn asked Anderson to check into the buyer's (JCM's) financial standing and obtain a financial statement from McGarry. Plaintiff's statement was prepared and presented to McGarry and Gleason as requested. However, Anderson failed to procure the statement on JCM that plaintiff had requested. Plaintiff testified that when he asked Anderson if he had obtained JCM's financial statement, Anderson reported that he had not, but JCM was worth $3½ million net.

Anderson testified that he did not remember telling plaintiff that the purchasing corporation was worth $3½ million net. He did, however, admit that the buyers had said they were worth millions. Anderson also admitted that he never made any inquiry into the buyer's financial standing.

2. Earlier the same day, Anderson, for himself and for UFA, had signed an earnest money agreement with McGarry wherein JCM agreed to purchase 20 acres of land owned jointly by Anderson and UFA for $100,000, which land was to be developed by JCM into a mobile home park by using the plaintiff's construction company to do the construction work. It was further anticipated that UFA would exclusively list and sell the mobile home lots, and that UFA and Anderson would ultimately handle upwards of $2 million in sales.

A local banker also testified that Anderson had told him that the buyers were sound.

On August 14, 1978, at Anderson's request, plaintiff met at the UFA office with Anderson, McGarry, Gleason and others, to finish preparing the paperwork necessary for closing the sale. The parties figured adjustments and prepared a rough draft of a closing statement. The closing statement included the $200,000 sale price, the $20,000 commission and the down payment of $40,-000, among the other items. Adjustments were made to reflect changes which had occurred in the company's inventory since it was listed. Plaintiff's receivables and payables were at this point included in the sale and offset against each other. After the receivables, payables and other adjustments had been taken into account, plaintiff was entitled to his $40,000 cash down and to an additional $44,000 note (rather than the $38,750 listed in the earnest money agreement), making an agreed equity in the company of $84,000.

After these adjustments were made, Anderson prepared two promissory notes, one for $44,000, and one for $35,000. Anderson also prepared several warranty deeds for the transaction, as well as a bill of sale for plaintiff's equipment. He had previously ordered preliminary title reports on plaintiff's land, which had been kept in the UFA file.

When documents were finally exchanged (August 14, 1978), plaintiff received the note for $44,000, payable over five years, as agreed. Rather than receiving the $40,000 cash down, however, plaintiff was given another note for $35,000 and told that he would receive the balance of $5,000 from the earnest money. When plaintiff expressed concern over this, Anderson assured him that the notes were "as good as gold" and that he would have no problem getting paid. Relying on Anderson, plaintiff accepted the unsecured notes totalling $79,-000, and the transfer was made.

The next day, plaintiff asked about a closing statement. Having dealt with UFA

previously, plaintiff knew that standard operating procedure called for a formal closing by UFA's attorney. There never was such review by an attorney and UFA points to this in claiming it to be evidence that Anderson was not acting on its behalf. Within a short time, JCM (and/or McGarry) had skimmed off the assets of the corporation. The unsecured notes were later deemed uncollectable. When accounts payable remained unpaid, creditors came after plaintiff, and he was ultimately compelled to file bankruptcy.

At trial, the court entered judgment against McGarry, Gleason and JCM for fraud. Anderson, Clan Stilson (UFA's broker) and UFA were found jointly liable for breaching their fiduciary duties. Judgment was entered in plaintiff's favor in the amount of $185,178.30.

## I. SUFFICIENCY OF EVIDENCE AGAINST UFA

UFA first contends that the evidence introduced at trial was insufficient to support a verdict against it. It claims that two issues arise from this contention: first, whether the relationship of employer-employee actually existed between Anderson and UFA; and second, assuming an employment relationship did exist, whether Anderson's actions were within the authorized scope of such employment.

With respect to the first issue, UFA takes the position that the evidence is not sufficient to establish an employer-employee relationship, but it is sufficient to prove that Anderson occupied the status of an "independent contractor." This position is allegedly based upon the test articulated by this Court in *Harry L. Young & Sons, Inc. v. Ashton* [3] for determining whether a person is an employer or an independent contractor:

Speaking in generality: an employee is one who is hired and paid a salary, a wage, or at a fixed rate, to perform the employer's work as directed by the employer and who is subject to a compara-

3. Utah, 538 P.2d 316 (1975).

tively high degree of control in performing those duties. In contrast, an independent contractor is one who is engaged to do some particular project or piece of work, usually for a set total sum, who may do the job in his own way, subject only to minimal restrictions or controls and is responsible only for its satisfactory completion.

538 P.2d at 318.

UFA maintains that there is no evidence indicating that UFA had the right or ability to control or direct Anderson's work, while there is ample evidence indicating that Anderson's activities and conduct were completely unsupervised by UFA or its broker, Clan Stilson. On the basis of this evidence, UFA avers that Anderson fit the description of an independent contractor.[4]

It is important to note that the question presented by this contention is not whether a relationship existed between Anderson and UFA. That a relationship of some fashion did in fact exist appears to have been established. The precise question here goes to the nature of the existing relationship, whether it be employer-employee or contractor-independent contractor. Although this question appears to be one of first impression in this state, it has been addressed in the recent past by the Supreme Court of the State of Alaska. In the case of *Calvo v. Calhoon*,[5] the Alaska court held:

> The Alaska statutory system governing real estate brokers and salespersons implies that the relationship is one of employer and employee. AS 08.88.171(c) states that a person must be "employed by a real estate broker" in order to be licensed as a "real estate salesman." AS 08.88.331 further provides that "[a] real estate salesman or associate real estate broker may make a real estate transaction only through the real estate broker who employs him." Thus, the resolution

of various issues in this case are [sic] governed by principles of employer/employee relations . . . .

559 P.2d at 113, 114.

We have reviewed this state's statutory system pertaining to real estate brokers and salespersons and find that it too contains numerous implications of an employer-employee relationship. U.C.A., 1953, § 61–2–3 defines a real estate salesman as "any person *employed* or engaged by or on behalf of a licensed real estate broker . . . ." Section 61–2–8, entitled "Termination of Salesman's *Employment*," contains the following language: "When any real estate salesman shall be discharged or shall terminate his *employment* with the real estate broker by whom he is *employed* . . . ." Furthermore, § 61–2–10 states that "[i]t shall be unlawful for any real estate salesman to accept a commission or valuable consideration . . . from any person, except his *employer*, who must be a licensed real estate broker."[6] This latter provision implies that a real estate salesman must be in an employer-employee relationship with a licensed broker to receive compensation for his services. We therefore adopt Alaska's rule, as set forth *supra*, and in accordance therewith hold that the relationship between UFA and Anderson was one of employer and employee.

Under the familiar doctrine of "respondeat superior," UFA, as Anderson's employer, may be subject to liability for Anderson's tortious acts. This rule is stated thus:

> The well-settled general rule is that a principal [employer] is liable civilly for the tortious acts of his agent [employee] which are done within the course and scope of the agent's employment.[7]

UFA's potential liability in this matter arises not only from its principal-agent (employer-employee) relationship with An-

---

4. Plaintiff's brief does not contain a responsive argument on the issue of whether Anderson, in his capacity as a real estate salesman, was an employee of UFA or an independent contractor.

5. Alaska, 559 P.2d 111 (1977).

6. Emphasis has been added to these statutory sections.

7. 3 Am.Jur.2d Agency § 267 (1962).

derson, but also from its principal-agent relationship with the plaintiff. As the listing broker of plaintiff's property, UFA became plaintiff's agent with respect to the sale of that property. Anderson's status in the relationship between UFA and plaintiff was that of a subagent. The liability of an agent for the acts of a subagent has been set forth as follows:

> Unless otherwise agreed, an agent is responsible to the principal for the conduct of a subservant or other subagent with reference to the principal's affairs entrusted to the subagent, as the agent is for his own conduct; and as to other matters, as a principal is for the conduct of a servant or other agent.[8]

And further:

> An agent who employs a subagent is the latter's principal and is responsible . . . to his principal for the subagent's derelictions. Thus, the agent is subject to liability to the principal for harm to the principal's property or business caused by the subagent's negligence or other wrong to the principal's interest . . . .[9]

UFA's position with respect to the second issue arising under this point of the appeal is that even if the relationship between Anderson and UFA was one of employer and employee, Anderson's alleged tortious acts are not imputable to UFA because they were committed outside "the course and scope of the agent's [Anderson's] employment," *supra,* and were done in furtherance of Anderson's own interests.[10]

UFA alleges that the following evidence is supportive of its position: after the signing of the listing agreement (UFA concedes that it listed the subject property), neither UFA nor its broker had any involvement in the transaction; the earnest money agreement was not executed on UFA forms; UFA's attorney did not participate in the closing, nor any other stage of the subject

transaction; and there were no seller's or buyer's statements furnished by UFA pursuant to its policies and procedures. In summary, UFA contends that Anderson's acts could not have been within the scope of his employment because they were in complete violation of UFA's established policies and practices.

Plaintiff's position on this issue is that the facts and the evidence in this case clearly indicate that Anderson's tortious acts were committed within the scope of his employment. Such facts and evidence are: UFA, through its agent, Anderson, listed plaintiff's construction business (on a UFA listing agreement); Anderson signed the listing agreement as UFA's local representative; such listing agreement included plaintiff's house, which was to be sold together with the construction business; plaintiff's house was sold separately, and a commission thereon was split by Anderson and UFA; UFA, through Anderson, had previously listed and sold other properties (motel and office building) belonging to plaintiff, and had split sizable commissions resulting from such sales; UFA advertised the construction business in its national sales catalogue; Anderson at all times represented plaintiff's interests in this transaction, just as he had in previous transactions; and a $20,000 (ten percent) commission to which only UFA had a right, by virtue of its listing agreement, appeared on the closing statement prepared by Anderson and the purchasers.

■ Under familiar rules of appellate review, we are constrained to view the evidence and all inferences that might reasonably be drawn therefrom in a light most favorable to the judgment entered.[11] Furthermore, we will not overturn the trial court's judgment so long as it is supported

---

**8.** Restatement (Second) of Agency § 406 (1958).

**9.** *Id.,* comment a.

**10.** *See Wells v. Walker Bank & Trust Co.,* Utah, 590 P.2d 1261 (1979).

**11.** *See Hal Taylor Associates v. Unionamerica, Inc.,* Utah, 657 P.2d 743 (1982); *Piacitelli v. Southern Utah State College,* Utah, 636 P.2d 1063 (1981).

by substantial evidence in the record.[12] In accordance with these review standards, it is our opinion that substantial evidence was adduced to establish that Anderson's acts were done within the course and scope of his employment.

■ In light of our conclusions upon the issues of this first point of UFA's appeal, we hold that Anderson's tortious conduct, with respect to the sale of plaintiff's construction business, is imputable to UFA in its dual fiduciary capacity as Anderson's principal and plaintiff's agent.

## II. PLAINTIFF'S CAPACITY TO SUE

The second point raised by UFA is that plaintiff, in his individual shareholder status, is not the proper party to maintain an action against the defendant third parties for wrongs allegedly committed upon the corporation (Phillips Construction Company). UFA points out that plaintiff incorporated his business in the early part of 1978, prior to the transaction with JCM. It also points out that plaintiff's complaint alleged damages, not only for JCM's failure to pay him for his personal equity in the company, but also for failure to pay the assumed company debts. In view of the incorporated nature of the company at the time of the sale, UFA asserts that the company debts were corporate debts and as such the corporation, not plaintiff, was the only entity entitled to their recovery.

UFA further asserts that inasmuch as plaintiff has filed bankruptcy during the pendency of this lawsuit, he is an improper party plaintiff. The purported authority for this assertion is Rule 610 of the Rules of Bankruptcy Procedure, which, UFA avers, provides that the trustee or receiver is the one who prosecutes or enters his appearance in defense in the pending action by or against the bankrupt.

Plaintiff's rejoinder to this contention is that he has capacity to sue by reason of his ownership of the assets of which he was defrauded and his personal liability for the debts which were assumed but not paid. While he admits he went through the bare motions of incorporation in early 1978, he denies having ever transferred his assets or equipment into the corporation, or having ever incurred any obligations in the name of the corporation. He alleges that he continued after incorporation to conduct business in his personal capacity rather than in a corporate capacity, and therefore all obligations and debts remained chargeable to him personally.

With respect to the bankruptcy issue raised by UFA, plaintiff avers that pursuant to Rule 610, *supra,* the trustee's appearance in a pending lawsuit brought by or against the bankrupt is discretionary, not mandatory as UFA suggests.

■ Furthermore, plaintiff contends that UFA has waived the right to raise this issue (lack of capacity) by reason of its failure to comply with the "specific negative averment" requirement of Rule 9(a)(1) of the Utah Rules of Civil Procedure. This rule provides in pertinent part:

> When a party desires to raise an issue as to the legal existence of any party or the *capacity of any party to sue* or be sued or the authority of a party to sue or be sued in a representative capacity, he shall do so by *specific negative averment,* which shall include such supporting particulars as are peculiarly within the pleader's knowledge, and on such issue the party relying on such capacity, authority, or legal existence, shall establish the same on the trial. [Emphasis added.]

The effect of noncompliance with the specific negative averment requirement has been adjudicated in other jurisdictions which have the same, or a similar, procedural rule. In the state of Washington, the State Court of Appeals has held that the required negative averment must be made before trial, either in the answer or by motion and affidavit.[13] In Kansas, the State Supreme Court has held:

---

**12.** *Id.*

**13.** *Reese Sales Co. v. Gier,* 16 Wash.App. 664, 557 P.2d 1326, 1329 (1977).

Under K.S.A. 60–209(a), an objection to the legal capacity of the plaintiff to sue may be taken by answer, and the defendant is required to do so by a specific negative averment, or it will be waived.[14]

We have surveyed the record pleadings and are unable to find therein a specific negative averment of plaintiff's lack of capacity to sue. We are therefore in agreement with plaintiff's contention that UFA has waived its right to raise this issue by reason of its failure to comply with Rule 9(a)(1). Accordingly, we find it unnecessary to discuss the merits of the various arguments, *supra,* raised under this point of UFA's appeal.

## III. STATUTE OF FRAUDS

The third point UFA raises on appeal is that the lack of a written agreement evidencing defendant JCM's assumption of plaintiff's debts and obligations constitutes a violation of the statute of frauds.[15] The alleged corollary to this violation is that the assumed obligations, as well as that portion of the judgment referring thereto, are void.

UFA alleges two grounds for this position. The first is that many of the debts introduced by plaintiff at trial under the category of assumed obligations were not included in the earnest money agreement nor in any other written and signed agreement, and were therefore violative of the statute of frauds. UFA points out that the earnest money agreement provided only for the assumption of "loans on company-building-equipment," and did not cover such obligations as tax liens, petroleum bills, building supplies, etc., which were included in plaintiff's evidence at trial.

The second alleged ground for this position is that the warranty deeds executed by plaintiff merged with the earnest money agreement resulting in the abrogation of the earnest money terms, and inasmuch as the warranty deeds did not include any written provision with respect to an assumption of obligations, such an assumption is unenforceable due to the obvious statute of frauds violation.

■ Again, we find it unnecessary to determine the merit of UFA's arguments relative to this issue, in light of a fatal procedural error committed by UFA. As conceded by UFA, the affirmative defense of the statute of frauds is being raised for the first time in this appeal, it was never pled below. This constitutes a violation of Rule 8(c) of the Utah Rules of Civil Procedure, which requires that affirmative defenses, such as the statute of frauds, be set forth in the pleadings.

The consequence of this procedural error is set forth in Rule 12(h), Utah R.Civ.P., which states that "[a] party *waives* all defenses and objections which he does not present either by motion as hereinbefore provided or, if he has made no motion, in his answer or reply . . . ." (Emphasis added.) Further, we have recently held:

> This Court will not consider on appeal issues which were not submitted to the trial court and concerning which the trial court did not have the opportunity to make any findings of fact or law.[16]

We therefore hold that the defense of statute of frauds cannot now be raised to attack the evidence received by the trial court.

Aside from the statute of frauds defense, UFA claims that plaintiff has waived his

**14.** *Moore v. Shanahan,* 207 Kan. 645, 486 P.2d 506, 511 (1971). *See also State ex rel. Dix v. Board of Education,* 215 Kan. 551, 527 P.2d 952 (1974).

**15.** Pursuant to U.C.A., 1953, § 25–5–4, which states in pertinent part:
In the following cases every agreement shall be void unless such agreement or some note or memorandum thereof, is in writing subscribed by the party to be charged therewith:

\* \* \* \* \* \*

(2) Every promise to answer for the debt, default or miscarriage of another . . . .

**16.** *Turtle Management, Inc. v. Haggis Management,* Utah, 645 P.2d 667, 672 (1982). *See also Shayne v. Stanley & Sons, Inc.,* Utah, 605 P.2d 775 (1980); *Lamkin v. Lynch,* Utah, 600 P.2d 530 (1979).

right to recover for the unpaid debts and obligations by reason of his failure to comply with Rule 9(g) of the Utah Rules of Civil Procedure. This rule states: "When items of special damage are claimed, they shall be specifically stated." UFA alleges that plaintiff's damages for the unpaid debts and obligations are special damages and that plaintiff failed to plead them specifically as required by the foregoing statute.

■ We do not agree that these damages are special damages and therefore hold that UFA's application of Rule 9(g) is misplaced. It is our opinion that these damages are general damages and as such were adequately alleged by plaintiff's general allegation of damages.[17]

This Court has previously recognized the following definitions of general and special damages:

> General damages are those which are *the natural and necessary result* of the *wrongful act* or omission asserted as the foundation of liability, and include those which follow as a conclusion of law from the statement of the facts of the injury.
>
> \*   \*   \*   \*   \*   \*
>
> Special damages are the natural, but not the necessary, result of an injury. In other words, special damages actually, but not necessarily, result from the injury, and thus are not implied by law . . . .[18] [Emphasis added.]

The undisputed "wrongful act" in this case was defendant JCM's failure to honor the assumption of plaintiff's debts and obligations, and "the natural and necessary result" (injury) of that "wrongful act" was the reimposition of liability for those debts and obligations upon plaintiff. The alleged $106,000 damages, then, represent only the value of that liability.

## IV. SUFFICIENCY OF EVIDENCE AGAINST ROBERT ANDERSON

UFA's arguments thus far have been based upon the assumption that the trial court's findings as to Anderson's tortious conduct were warranted. Under this point of the appeal, however, UFA submits that the evidence is insufficient to support a verdict against Anderson for breach of fiduciary duties owed to plaintiff.

The first finding contested by UFA is finding No. 25 of the trial court's findings of fact and conclusions of law, which states that Anderson breached his fiduciary duty by unilaterally determining not to represent plaintiff and by not advising plaintiff that he was not representing him in the sale of the business. UFA claims that plaintiff relinquished his right to Anderson's expertise and agency when he negotiated privately with the purchasers regarding the terms of the earnest money agreement and signed said agreement after being advised by Anderson that its terms were not in accordance with the Bulk Sales Act.

The second contested finding is No. 26, wherein the trial court concluded that Anderson had breached his fiduciary duty in that he did not investigate the solvency of JCM. UFA contends that there is no duty on the part of a real estate agent to ascertain the financial solvency of a purchaser.

The third finding, No. 27, disputed by UFA, states that Anderson breached his fiduciary duty by failing to have an attorney conduct the closing. UFA claims that Anderson did not intend the August 14, 1978 meeting as a closing, and further, that his participation in the events of that meeting was very minimal since the transaction was conducted under the authority of Gleason (J.G. Realty).

Our survey of the record reveals that there is substantial evidence to sustain the trial court's findings as to Anderson's breach of fiduciary duties. We reiterate our rule with respect to reviewing the findings and judgment of the trial court:

> In considering the attack on the findings and judgment of the trial court, it is our

---

17. *See Cohn v. J.C. Penney Co.,* Utah, 537 P.2d 306 (1975); 22 Am.Jur.2d Damages § 15 (1965).

18. *Id.*

duty to follow these cardinal rules of review: to indulge them a presumption of validity and correctness; to require the appellant to sustain the burden of showing error; to review the record in the light most favorable to them; and not to disturb them if they find substantial support in the evidence.[19]

The trial court found that Anderson had breached at least five duties owed to plaintiff.[20] With respect to Anderson's duty to advise plaintiff that he was no longer representing him in the sale of the construction business (finding No. 25), the record shows: plaintiff was never informed by Anderson or UFA that the agreed-upon representation evidenced by the listing agreement had terminated; Anderson's testimony that he had informed all parties that he would not participate in the sale if it were conducted as a simple stock transfer was contradicted by the testimony of plaintiff and others; and Anderson's participation continued through the consummation of the transaction. This evidence substantially supports the trial court's finding No. 25.

As to finding No. 26, the record shows that Anderson, on numerous occasions, represented to plaintiff that the purchaser corporation was worth millions of dollars and that plaintiff could rely upon their good credit. Furthermore, the evidence shows that plaintiff asked Anderson to obtain a financial statement on JCM, and, although Anderson agreed to obtain such statement, he failed to do so.

In light of the duty of a real estate salesman and his broker to exercise reasonable skill and diligence on behalf of the principal they represent, we have previously held, and continue to hold, that the principal is justified in relying upon information received from the salesman and broker without making an independent investigation.[21] Not only did Anderson fail to obtain the requested financial statement on JCM, he represented to plaintiff, as indicated *supra,* that JCM was financially sound. Plaintiff was therefore justified in relying upon this representation without making an independent investigation on JCM's financial status.

With respect to finding No. 27, the evidence shows that Anderson testified that UFA policy required that he use an attorney to close his sales. Furthermore, it was shown that on prior sales Anderson had prepared closing documents, just as he did here, and then had taken plaintiff to an attorney who finished the closings. Plaintiff testified that he expected this same procedure to occur in the present transaction, and that he asked Anderson for a closing statement on August 15, 1978. However, Anderson told plaintiff that a closing statement was not necessary and never did provide one to plaintiff, despite plaintiff's repeated requests. This evidence is substantial support for the trial court's finding No. 27.

The judgment of the trial court is affirmed. Costs to plaintiff.

STEWART, OAKS and DURHAM, JJ., concur.

HOWE, Justice (concurring):

I concur and add the following observation as to Part III of the Court's opinion. While I agree that UFA did not raise the defense of the statute of frauds in its answer and therefore is deemed to have waived it, a more basic reason for denying UFA that defense is that UFA may not properly assert it. U.C.A., 1953, § 25–5–

---

**19.** *Hutcheson v. Gleave,* Utah, 632 P.2d 815 (1981); *Charleton v. Hackett,* 11 Utah 2d 389, 360 P.2d 176 (1961).

**20.** In addition to those breaches of duty delineated above in findings No. 25 through No. 27, the trial court found: Anderson had a duty to prevent the plaintiff from accepting unsecured notes and from parting with his assets unless proper collateral was provided to assure pay-

ment; and Anderson had the duty to investigate the background of J.G. Realty. Inasmuch as UFA does not specifically contest these latter two findings, we find it unnecessary to discuss them herein.

**21.** *See Smith v. Carroll Realty Co.,* 8 Utah 2d 356, 335 P.2d 67 (1959).

4(2) requires every promise to answer for the debt, default or miscarriage of another to be in writing, subscribed by the party to be charged therewith. The plaintiff did not seek to enforce against UFA an oral promise made by it to pay his debts. It is not claimed that UFA ever made any such promise, either orally or in writing. The statute of frauds might be a defense which JCM and McGarry could properly raise but it is unavailing to UFA. The lower court found liability on the part of UFA for the plaintiff's debts because they were an item of damage suffered by the plaintiff when UFA and Anderson failed to perform their duty to the plaintiff, their client.

In another claim UFA argues that the earnest money agreement was merged into the warranty deeds later executed by the plaintiff and that since the warranty deeds contained no provision for the assumption of any obligations by the buyer, the provision in the earnest money agreement requiring the buyer to pay the obligations is rendered nugatory. See *Rasmussen v. Olsen,* Utah, 583 P.2d 50 (1978). While this claim by UFA is separate and apart from the defense of the statute of frauds, the same answer applies. The doctrine of merger of the two instruments might well be a proper defense for JCM and McGarry. However, it is unavailing to UFA since UFA's liability arises because of its failure to provide a written agreement signed by JCM at closing in which JCM agreed to assume and pay the plaintiff's obligations. The doctrine of merger is no defense in that instance.