HARV L. JEPPSEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jeppsen v. Commissioner
Docket No. 26718-92
United States Tax Court
T.C. Memo 1995-342; 1995 Tax Ct. Memo LEXIS 344; 70 T.C.M. (CCH) 199; T.C.M. (RIA) 95342; July 26, 1995, Filed *344 Decision will be entered under Rule 155. For petitioner: Shawn D. Turner and R. Bret Jenkins. For respondent: J.A. Lopata and James B. Ausenbaugh. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined a deficiency of $ 61,298 in petitioner's 1987 Federal income tax and an addition to tax under section 6651 of $ 9,735. After concessions by respondent, the issue remaining for decision is whether petitioner is entitled to a theft loss deduction for 1987 in the amount of $ 166,627. Unless otherwise indicated all section references are to the Internal Revenue Code in effect for 1987, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time he filed his petition, petitioner resided in Farmington, Utah. Petitioner graduated from high school but never attended college. In the mid-1980's, petitioner was a carpet installer and owned a floor covering business from which he saved a substantial sum of money. Petitioner planned on eventually using this money to buy a home or to reinvest in his floor covering business. In February or March of 1986, *345 petitioner decided to invest some of the money he had saved through George Barker (Barker), a securities dealer with the brokerage firm of E.F. Hutton Group, Inc. (E.F. Hutton). Petitioner had no prior experience investing in stocks or stock options. Barker knew that petitioner was not experienced or sophisticated in securities investments. Barker, without petitioner's knowledge, falsified records of petitioner's new E.F. Hutton account to reflect that petitioner was an experienced investor in stocks and stock options. Barker also obtained petitioner's signature for the purpose of establishing petitioner's E.F. Hutton account as a discretionary account in order to authorize Barker to transact securities trades in the account. The discretionary nature of petitioner's E.F. Hutton account, however, never received the required approval by management of E.F. Hutton, but Barker immediately began to "churn" petitioner's investments by purchasing and selling various call options. [1]
*346 In September of 1986, Barker left E.F. Hutton and began working at the brokerage securities firm of Piper, Jaffray and Hopwood (PJ&H). In December of 1986, Barker informed petitioner of his new employment with PJ&H, and he asked petitioner to transfer petitioner's E.F. Hutton account to PJ&H so that Barker could continue to act as petitioner's broker. Acting on Barker's request, petitioner transferred the securities investments in his E.F. Hutton account to an account at PJ&H. Barker requested petitioner to then open a margin account, and Barker instructed petitioner to sign a PJ&H margin account authorization form. Barker, however, did not inform petitioner that a margin account would give Barker authority to purchase securities on behalf of petitioner on credit. Documents required by PJ&H to establish petitioner's PJ&H account as a discretionary account were never signed by petitioner. Despite the fact that the discretionary nature of petitioner's PJ&H account was not properly established, Barker treated petitioner's account at PJ&H as a discretionary account, and Barker purchased highly speculative penny stocks for petitioner's PJ&H account, including stock in Rhodes Charter *347 House Group. The price of the stock in Rhodes Charter House Group was then manipulated by Barker and by his business associate, Richard Hermansen (Hermansen), apparently through repeated purchases and sales of the stock. Hermansen was later indicted on over 40 Federal criminal counts, including securities fraud, mail fraud, and tax fraud. Barker also began churning blue chip stocks in petitioner's PJ&H account. An examination of petitioner's PJ&H account using the Securities and Exchange Commission Looper Analysis [2] showed per se churning of the stocks in petitioner's account. In approximately July of 1987, when petitioner showed one of his PJ&H account statements to his father, petitioner became aware of problems with his PJ&H account. After examining the statements, petitioner's father informed petitioner that the existence of a minus sign next to one of the *348 numbers on the account statement might indicate that Barker was purchasing stock for petitioner on credit. Petitioner then asked Barker about the transactions in petitioner's PJ&H account, at which time Barker informed petitioner that because the account constituted a margin account, Barker had been purchasing securities for the account on credit. Petitioner immediately told Barker to close the margin account. When petitioner received the next monthly account statement from PJ&H, petitioner noticed that the margin account had not been closed. Petitioner again instructed Barker to close the margin account. Barker, however, continued to sell certain stocks and stock options in petitioner's margin account, and he failed to close the account. On October 7, 1987, petitioner specifically instructed Barker to immediately liquidate to cash the entire balance of his PJ&H account, except for a mutual fund. Barker assured petitioner that the account would be liquidated, but Barker told petitioner that it would take a number of days to complete the liquidation. The parties have stipulated that, in fact, liquidation of petitioner's account could and should have been accomplished in one day. *349 In attempting to liquidate part of petitioner's PJ&H account, Barker tried to sell a call option. PJ&H's Minneapolis office questioned the "naked" sale of the call option. Partly because of its sophisticated nature, the attempted sale of the call option was regarded as an extremely risky transaction, and PJ&H's Minneapolis office requested that petitioner sign a special authorization letter to give Barker authority to sell the call option. Instead of waiting for petitioner to sign an authorization letter, Barker forged petitioner's signature and altered other documents in petitioner's PJ&H file to falsely reflect that petitioner's approval had been obtained to sell the call option. Most of the problems with petitioner's PJ&H account were brought to petitioner's attention after the stock market fell on October 19, 1987. On this date, known as "Black Monday", the Dow Jones Industrial Average decreased in value by 22.6 percent. As a result, petitioner's PJ&H account declined in value by approximately $ 194,000. The week after October 19, 1987, petitioner met with Don Larkin (Larkin), PJ&H's branch manager and Barker's supervisor, to discuss losses petitioner had suffered in his PJ&H *350 account. Larkin told petitioner that because of the nature of petitioner's margin account and the losses petitioner had suffered, all securities in petitioner's PJ&H account would have to be sold to cover the losses. During the above meeting, petitioner informed Larkin that petitioner had been unaware of many of the transactions that had occurred in his PJ&H account. Larkin admitted to petitioner that Barker's actions with respect to petitioner's PJ&H account had been improper. Specifically, Larkin admitted that petitioner had never properly authorized discretionary investing by Barker on his behalf. On October 26, 1987, Larkin formally reprimanded Barker for the unauthorized discretionary trading in petitioner's PJ&H account. Larkin, however, denied any liability of PJ&H for Barker's actions. At the end of October of 1987, petitioner approached an attorney about the possibility of investigating Barker's actions with regard to petitioner's brokerage accounts at E.F. Hutton and PJ&H. The attorney's investigation resulted in the receipt by petitioner of a letter dated December 21, 1987, from the law firm of Van Cott, Bagley, Cornwall, and McCarthy, PJ&H's legal counsel, which denied *351 on behalf of PJ&H any responsibility for petitioner's securities losses in his PJ&H account and which claimed that petitioner was merely a frustrated investor who had lost money as a result of the October 19, 1987, fall in the stock market. At that time, the attorney did not pursue, on petitioner's behalf, any legal action against PJ&H or Barker. At about this time, petitioner transferred his securities investments in the PJ&H account to an account with a securities broker by the name of Franklin Richards (Richards). In December of 1987, petitioner contacted attorneys with the Salt Lake City law firm of Callister, Duncan, and Nebeker about representing petitioner in an action to recover petitioner's securities losses. The attorneys agreed to represent petitioner but required that petitioner pay the law firm on an hourly basis and not on a contingency fee basis. The attorneys informed petitioner that there was a possibility that petitioner could prevail in a lawsuit but that the lawsuit would be long and costly. Petitioner informed the attorneys that he wished to proceed with some type of legal action to recover his losses. In March of 1988, petitioner's new attorneys filed on petitioner's *352 behalf a complaint in the U.S. District Court for the District of Utah (District Court). The complaint alleged violations of Federal and State securities laws and common law fraud by E.F. Hutton, PJ&H, and Barker. PJ&H never filed an answer to the complaint. [3]
On May 9, 1988, PJ&H filed a motion to compel arbitration of the case. On December 27, 1989, after allowing the parties to conduct some discovery, the motion for arbitration was granted by the District Court. During the arbitration proceedings, the law firm of Callister, Duncan, and Nebeker agreed to change its fee arrangement with petitioner to a contingency fee basis. By that time, petitioner had paid the law firm approximately $ 180,000 in legal fees and costs. On March 17, 1993, after 3 years of additional discovery and negotiations in the arbitration proceedings, petitioner filed a claim with the National Association of Securities Dealers Arbitration Panel *353 (Arbitration Panel). On January 11, 1994, the Arbitration Panel rendered a judgment in favor of petitioner against PJ&H, Barker, and Larkin in the amount of $ 603,000. The Arbitration Panel also included in the judgment punitive damages awards in favor of petitioner against Barker of $ 250,000 and against Larkin of $ 250,000. The judgment of the Arbitration Panel was appealed to and affirmed by the District Court, but an appeal was taken to the U.S. Court of Appeals for the Tenth Circuit. Before the Tenth Circuit rendered a decision on the appeal, the parties apparently entered into a confidential settlement of the dispute. Petitioner and respondent stipulated that Barker's actions against petitioner constituted a theft for purposes of Utah State law. On his 1987 Federal income tax return, petitioner claimed a theft loss deduction in the amount of $ 166,627 relating to the losses he incurred in his E.F. Hutton and in his PJ&H brokerage accounts. Respondent disallowed the claimed theft loss deduction on the basis that petitioner had a reasonable prospect of recovering his loss as of the close of 1987. OPINION Section 165(a) allows a deduction for any loss "sustained" during the *354 taxable year and not compensated for by insurance or otherwise, including losses arising from theft. Sec. 165(c)(3). A loss arising from theft is treated as sustained during the taxable year in which the taxpayer discovers the theft loss and in which the loss is evidenced by a "closed and completed" transaction. Sec. 165(e); sec. 1.165-1(d)(1), Income Tax Regs. Whether there has been a closed and completed transaction evidencing the loss may depend on the taxpayer's prospects of receiving reimbursement for the loss. Sec. 1.165-1(d)(2)(i), Income Tax Regs. If at the close of the year there exists a claim for reimbursement "with respect to which there is a reasonable prospect of recovery", no portion of the theft loss will be considered to have been sustained in that year, and the theft loss will not be considered sustained until it becomes reasonably certain that reimbursement will not be received. Sec. 1.165-1(d)(3), Income Tax Regs.
Whether the taxpayer, as of the close of a year, has a reasonable prospect of recovering a theft loss depends upon the facts and circumstances of each case. Boehm v. Commissioner, 326 U.S. 287, 292-293 (1945); Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), *355 affg. T.C. Memo. 1979-479; Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974). One of the factors that is relevant in the determination of whether a taxpayer has a reasonable prospect of recovering a theft loss is whether the taxpayer filed a lawsuit to recover the loss. Dawn v. Commissioner, supra at 1078; Estate of Scofield v. Commissioner, 266 F.2d 154, 159 (6th Cir. 1959), affg. in part and revg. in part 25 T.C. 774 (1956). Even if a lawsuit was not filed as of the close of the year for which the taxpayer claims a theft loss deduction, the filing of a lawsuit soon after the close of the year suggests that the taxpayer did not consider the loss closed and completed. Dawn v. Commissioner, supra at 1078; National Home Prods., Inc. v. Commissioner, 71 T.C. 501, 526 (1979). The loss deduction need not be postponed if the potential for success of a claim is remote or nebulous. Ramsay Scarlett & Co. v. Commissioner, supra at 811. *356 Also, where the financial condition of the person against whom a claim is filed is such that no actual recovery could realistically be expected, the loss deduction need not be postponed. Gottlieb Realty Co. v. Commissioner, 28 B.T.A. 418, 420-421 (1933). If the taxpayer's claim is not speculative or wholly without merit, and if the taxpayer believes that the chance of recovering the loss is sufficiently probable to warrant bringing a lawsuit and prosecuting it with reasonable diligence to a conclusion, the taxpayer generally should wait until the conclusion of the lawsuit to claim the theft loss deduction. Estate of Scofield v. Commissioner, supra at 159. The test for determining whether the taxpayer had a reasonable prospect of recovering a theft loss is primarily an objective test, Ramsay Scarlett & Co. v. Commissioner, supra at 812, but the taxpayer's subjective belief as of the close of the year that there is a reasonable prospect of recovering the loss is also an important and relevant factor. Boehm v. Commissioner, supra at 292-293. Also relevant *357 is the amount of time and money spent by the taxpayer investigating and prosecuting the claim and whether the taxpayer ultimately recovered the loss. National Home Prods., Inc. v. Commissioner, supra at 526; Gale v. Commissioner, 41 T.C. 269, 276 (1963); Huey v. Commissioner, T.C. Memo. 1985-348. As stated, petitioner and respondent agree that under Utah State law the activities of Barker constituted a theft. Petitioner and respondent, however, disagree as to whether petitioner was entitled to a theft loss deduction for 1987, the year in which the theft was discovered. Petitioner emphasizes that, as of the close of 1987, he had not filed a lawsuit against Barker or the brokerage firms for which Barker worked. The law firm representing petitioner initially refused to accept petitioner's case on a contingency fee basis, and PJ&H initially denied any responsibility for petitioner's losses. Petitioner argues that based on these facts, among others, any claim that petitioner may have had as of the close of 1987 was speculative, and any prospect of recovering the loss was remote. We agree *358 with respondent. As of the close of 1987, petitioner had already met with his attorneys and had decided to file a claim. The fact that the law firm refused to accept petitioner's case on a contingency fee basis does not necessarily make petitioner's prospects of recovery unreasonable. Even though extensive additional discovery may have been necessary to prove petitioner's claim, petitioner's attorney testified that from his initial review of petitioner's case in January of 1988, the evidence then available clearly showed that misrepresentations had been made by Barker to petitioner, that Barker had illegally churned the securities in petitioner's account, and that Barker had conducted transactions with respect to petitioner's account without petitioner's authorization. This evidence, which was available to petitioner and to his attorneys as of the close of 1987, included petitioner's own testimony and the PJ&H account statements that showed unauthorized margin trading. Petitioner's claim, as of the close of 1987, was also supported by the admission of Larkin that Barker's actions had been improper. In light of the evidence in this case, we conclude that petitioner's claim against *359 Barker, as of the close of 1987, was not speculative and that petitioner's prospects of recovering the theft loss were not remote or nebulous. We also conclude that because of the employee/employer relationship between Barker and PJ&H, petitioner also had a reasonable prospect of prevailing on a claim against PJ&H. See Clover v. Snowbird Ski Resort, 808 P.2d 1037 (Utah 1991) (employer held liable for torts of employee under doctrine of respondeat superior); Krukiewicz v. Draper, 725 P.2d 1349 (Utah 1986); Phillips v. JCM Dev. Corp., 666 P.2d 876 (Utah 1983); see also SEC v. Management Dynamics, Inc., 515 F.2d 801 (2d Cir. 1975) (broker-dealer held liable under 1934 Securities Act as a "controlling person"). Although the parties offered no evidence regarding Barker's financial ability to satisfy petitioner's claim against him, PJ&H would appear clearly to have the financial ability to satisfy petitioner's claims. PJ&H is a national brokerage firm that was listed on the New York Stock Exchange in 1987. For a company to have been listed on the New York Stock Exchange *360 at that time, the company had to have net assets of $ 18 million. NYSE Listed Co. Manual Regs., sec. 102.01. The evidence, viewed as a whole, supports our conclusion that petitioner, as of the close of 1987, had a reasonable prospect of recovering his theft loss. We sustain respondent's disallowance of the theft loss deduction petitioner claimed for 1987. Decision will be entered under Rule 155. Footnotes
1. "Churning" occurs when a broker engages in excessive trading in disregard of the customer's investment objectives solely for the purpose of generating commissions. Call options are options to buy a specified number of securities at a specified price at a specified filing date.↩
2. The Looper Analysis is a method developed by the Securities and Exchange Commission to evaluate the level of churning in security brokerage accounts.↩
3. Although E.F. Hutton was named as a defendant, E.F. Hutton was later dismissed as a defendant.↩