**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 31 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

HARV L. JEPPSEN,

      Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent-Appellee.

No. 96-9002

---

**Appeal from the United States Tax Court**
**(T.C. No. 26718-92)**

---

Bill Thomas Peters, Parsons, Davies, Kinghorn & Peters, Salt Lake City, Utah, for
Petitioner-Appellant.

Sarah K. Knutson, United States Department of Justice, Washington, DC
(Teresa E. McLaughlin, United States Department of Justice, Washington, DC,
with her on the brief), for Respondent-Appellee.

---

Before **EBEL**, Circuit Judge, **McWILLIAMS,** Senior Circuit Judge, and
**KELLY**, Circuit Judge.

---

**EBEL**, Circuit Judge.

---

    In 1987, a stockbroker misappropriated $194,000 from petitioner-appellant

Harv L. Jeppsen.  Jeppsen claimed a deduction for this theft loss on his 1987

federal income tax return. In 1988, Jeppsen began a seven-year litigation campaign to recover his stolen money. In 1992, respondent-appellee Commissioner of Internal Revenue ("the IRS") disallowed Jeppsen's 1987 theft loss deduction, on the grounds that it was reasonably foreseeable by the end of 1987 that Jeppsen would recover the stolen money. Shortly thereafter, Jeppsen challenged this disallowance in tax court.

In March, 1995, Jeppsen's campaign to recover his stolen money achieved fruition, when Jeppsen was awarded almost $1,500,000 in general and punitive damages, interest, attorney's fees, and costs. Four months later, after learning of this award, the tax court agreed with the IRS that Jeppsen was not entitled to the theft loss deduction claimed on his 1987 tax return. Jeppsen appeals the decision of the Tax Court. Because we find that as of December 31, 1987, it could not be ascertained with reasonable certainty that Jeppsen would *not* recover his stolen money, we affirm.

## BACKGROUND

The facts of the present case are largely undisputed. In February or March of 1986, appellant Harv L. Jeppsen, a self-employed carpet installer and high school graduate, began investing money through George Barker, a securities dealer with the E.F. Hutton Group brokerage firm. Jeppsen v. Commissioner, 70

T.C.M. (CCH) 199, 199, T.C.M. (P-H) ¶ 95,342 (1995), T.C. Mem. No. 1995-342. At that time, Jeppsen had no prior experience investing in stocks or stock options.

Barker, who knew that Jeppsen was not experienced or sophisticated in securities investments, fraudulently established Jeppsen's E.F. Hutton account as a discretionary account in order to authorize Barker to transact securities trades in the account. Shortly thereafter, Barker began to "churn" Jeppsen's investments by purchasing and selling various call options.

In September, 1986, Barker left E.F. Hutton and began working at the brokerage securities firm of Piper, Jaffray and Hopwood, Inc. ("PJ & H"). In December, 1986, Jeppsen transferred his E.F. Hutton account to PJ & H so that Barker could continue to act as his broker. At that time, Barker fraudulently obtained Jeppsen's signature on documents needed to open a PJ & H margin account in Jeppsen's name. In addition, without Jeppsen's permission and without ever obtaining Jeppsen's signature, Barker established Jeppsen's primary PJ & H account as a discretionary account. Barker then invested much of the money in this account in certain "penny stocks" whose price was manipulated by Barker and an accomplice through repeated purchases and sales.

In July, 1987, Jeppsen became aware of Barker's activities, and ordered Barker to close his margin account immediately. Barker failed to close the account. When Jeppsen received his next monthly statement indicating that the

margin account had not been closed, Jeppsen again ordered Barker to close the margin account. Barker again failed to close the account, and continued to execute new transactions in the account.

On October 7, 1987, Jeppsen specifically instructed Barker to immediately liquidate to cash the entire balance of Jeppsen's PJ & H account, except for a mutual fund. Barker did so slowly, forging Jeppsen's signature when necessary to liquidate certain high-risk derivative investments that Jeppsen had never authorized him to make.

On October 19, 1987, a date popularly known as "Black Monday," the Dow Jones Industrial Average decreased in value by 22.6 percent. As a result, Jeppsen's PJ & H account, which had not yet been liquidated, declined in value by approximately $194,000.

The following week, Jeppsen met with PJ & H's branch manager and Barker's supervisor, Don Larkin, to discuss the losses Jeppsen had suffered in his PJ & H account. Larkin initially told Jeppsen that because of the large negative balance in Jeppsen's margin account all securities in his discretionary account would have to be sold to pay Jeppsen's debt to PJ & H. When Jeppsen protested that the trading losses had been caused by Barker's unauthorized activities in Jeppsen's name, Larkin admitted to Jeppsen that Barker's activities had been improper. Larkin then formally reprimanded Barker for the unauthorized

discretionary trading in Jeppsen's PJ & H account. Nonetheless, Larkin denied that PJ & H was liable in any way for Barker's actions.

At the end of October, 1987, Jeppsen retained an attorney to investigate Barker's actions with regard to Jeppsen's brokerage accounts at E.F. Hutton and PJ & H. This attorney's inquiries spurred PJ & H's legal counsel to send Jeppsen a letter dated December 21, 1987. The letter denied that PJ & H was in any way responsible for Jeppsen's losses in his PJ & H account, and claimed that Jeppsen was merely a frustrated investor who had lost money as a result of the October 19, 1987 fall in the stock market.

In December, 1987, a Salt Lake City law firm agreed to represent Jeppsen in an action to recover his losses, but required Jeppsen to pay on an hourly rather than contingency fee basis. The law firm told Jeppsen that he had a chance to win, but that the lawsuit would be long and costly. Jeppsen responded that he would nonetheless like to proceed with some type of legal action.

On March 5, 1988, Jeppsen filed suit against Barker, PJ & H, and E.F. Hutton in federal district court in Utah. Jeppsen v. Piper, Jaffray & Hopwood, Inc., 879 F. Supp. 1130, 1132-33 (D. Utah 1995). On May 9, 1988, PJ & H moved to stay proceedings pending arbitration and to compel arbitration.

In July, 1988, while PJ & H's motion was under consideration by the district court, Jeppsen filed his 1987 federal income tax return. On his return,

Jeppsen claimed a theft loss deduction in the amount of $166,627 relating to the losses he incurred in 1987 in his E.F. Hutton and in his PJ & H brokerage accounts.[1]

On December 26, 1989, the district court granted PJ& H's motion to stay proceedings pending arbitration and to compel arbitration. Jeppsen v. Piper, Jaffray & Hopwood, Inc., 879 F. Supp. 1130, 1133 (D. Utah 1995). On December 11, 1991, Jeppsen settled his claims against E.F. Hutton. Around that time, and after Jeppsen had already paid them $180,000, Jeppsen's law firm changed its fee arrangement to a contingency basis.

On August 31, 1992, the IRS mailed Jeppsen a Notice of Deficiency regarding Jeppsen's 1987 federal income tax. (R. Vol. III Doc. J Exh. 2-B). The claimed deficiency of $61,297.78[2] resulted from the IRS's disallowance of Jeppsen's $166,627 theft loss deduction. The IRS disallowed the deduction on the ground that Jeppsen had a reasonable prospect of recovering his loss as of the

---

[1]Jeppsen's theft loss deduction of $166,627 was less than his claimed actual theft loss of $193,712 because the IRS requires actual theft losses to be reduced by ten percent of adjusted gross income, plus $100, prior to being deducted. See 1987 IRS Form 4684 (R. Vol. III Doc. 1).

[2]The IRS also assessed Jeppsen an addition to tax of $9,735 under I.R.C. § 6651, due to Jeppsen's delinquency in paying the deficiency of $61,297.78 which the IRS claimed should have been paid with Jeppsen's 1987 tax return. (R. Vol. III Doc. J Ex. 2-B).

close of 1987. On November 25, 1992, pursuant to I.R.C. § 7442, Jeppsen filed a petition in the United States Tax Court, challenging the Notice of Deficiency.

On March 17, 1993, before his tax case was tried, Jeppsen filed his Statement of Claim with the National Association of Securities Dealers, which was to preside over the compelled arbitration against Piper, Jaffray and Barker & Larkin. Jeppsen v. Piper, Jaffray & Hopwood, Inc., 879 F. Supp. 1130, 1133 (D. Utah 1995). A five-day arbitration hearing was held in November, 1993 in Salt Lake City, Utah. On January 20, 1994, the arbitration panel awarded Jeppsen damages of $603,000 (treble damages) plus attorneys' fees and costs of $388,541.55 against PJ & H, Barker, and Larkin, jointly and severally, plus $250,000 each in punitive damages against Larkin and Barker separately and individually. This award, however, was subject to appeal to the federal district court which had ordered the arbitration.

On March 17, 1994, Jeppsen's challenge to the IRS's Notice of Deficiency was tried before the United States Tax Court in Salt Lake City, Utah. At that proceeding, the tax court was apprised that Jeppsen had won an award from the arbitration panel, but that the award was not final because the arbitration defendants still had until April 18, 1994 to appeal the award to the district court.[3]

---

[3] See Jeppsen v. Commissioner, 70 T.C.M. (CCH) 199, 201, T.C.M. (P-H) ¶ 95,342 (1995), T.C. Mem. No. 1995-342 (reporting sums awarded to Jeppsen).

At the conclusion of the two-hour hearing, the tax court requested further briefing from the parties and took the case under advisement.

On March 6, 1995, while Jeppsen's tax case was still under advisement, the arbitration panel's award in Jeppsen's case against PJ & H, Barker, and Larkin was confirmed by the United States District Court for the District of Utah. Jeppsen v. Piper, Jaffray & Hopwood, Inc., 879 F. Supp. 1130, 1140 (D. Utah 1995). The defendants appealed to the Tenth Circuit, but settled the case in June, 1995, before the appeal was heard. Jeppsen v. Commissioner, 70 T.C.M. (CCH) 199, 201, T.C.M. (P-H) ¶ 95,342 (1995), T.C. Mem. No. 1995-342; (Aplt.'s App. at 74). The details of the settlement were confidential.

Shortly thereafter, an IRS attorney notified Jeppsen that the tax court had inquired as to whether a settlement had been reached in Jeppsen's case against PJ & H, Barker, and Larkin, and that the IRS had answered the tax court's inquiry in the affirmative. In response to these events, Jeppsen filed a Motion To Strike from the tax court proceedings "any information, evidence, or otherwise before the Court which relates to any result, decision, opinion, or otherwise promulgated by the United States Court of Appeals for the Tenth Circuit, the United States District Court for the District of Utah or the National Association of Securities Dealers, or which relates to any settlement by the parties of any matters pending

before such entities and related to [Jeppsen's case against PJ & H, Barker, and Larkin]." (Aplt.'s App. at 72-73.)

On July 24, 1995, the tax court denied Jeppsen's Motion to Strike. In a brief Order, the court stated that it had requested information regarding the current status of Jeppsen's lawsuits "solely for purposes of completeness." It also noted that "the terms of the settlement of the lawsuit . . . were not disclosed to the Court and that the confidentiality of the settlement was not breached." (Aplt.'s App. at 78.)

Two days later, on July 26, 1995, the tax court issued a Memorandum Opinion sustaining the IRS's disallowance of the theft loss deduction Jeppsen claimed for tax year 1987. Jeppsen v. Commissioner, 70 T.C.M. (CCH) 199, 202, T.C.M. (P-H) ¶ 95,342 (1995), T.C. Mem. No. 1995-342. Jeppsen now appeals. We exercise appellate jurisdiction pursuant to I.R.C. § 7482(a).

## DISCUSSION

Under the Internal Revenue Code, a taxpayer may deduct from taxable income "any loss sustained during the taxable year and not compensated for by insurance or otherwise." I.R.C. § 165(a). Under Section 165(c), such a loss includes "losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from . . . theft." I.R.C. § 165(c)(3). The IRS concedes that Barker's actions constitute "theft," and that

-9-

Jeppsen's loss therefore qualifies as a "theft loss" within the meaning of I.R.C. § 165. (Appellee's Br. at 17). We agree. See Treas. Reg. § 1.165-8(d) (defining theft broadly to include larceny).

At issue here is whether Jeppsen's theft loss was "sustained" during tax year 1987. Under the Internal Revenue Code, a theft loss is *not* "sustained" at the time the theft actually occurs. Rather, "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." I.R.C. § 165(e). Further, the Treasury Regulations provide that even after a theft loss is discovered, if a claim for reimbursement exists during the year of the loss with respect to which there is a reasonable prospect of recovery, then a theft loss is treated as "sustained" only when "it can be ascertained with reasonable certainty whether or not such reimbursement [for the loss] will be obtained." Treas. Reg. §§ 1.165-1(d)(2)(i), 1.165-1(d)(3); accord Treas. Reg. § 1.165-8(a)(2). In essence, this has been interpreted to mean that the existence of a claim of reimbursement with a reasonable prospect of recovery will prevent a loss from being considered as "sustained" unless and until it is determined with reasonable certainty that such reimbursement will not be obtained. See, e.g. Rainbow Inn, Inc. v. Commissioner, 433 F.2d 640, 643-44 (3rd Cir. 1970).

In the present case, based on the evidence before it the tax court found that, as of December 31, 1987, a viable legal claim for reimbursement existed and

-10-

there was a reasonable prospect that Jeppsen would recover his stolen $194,000. For this reason, the tax court held that Jeppsen did not "sustain" a theft loss in 1987.

Jeppsen claims that the tax court erred in two principal respects. First, Jeppsen claims that the court should not have considered events that transpired after December 31, 1987, in determining whether Jeppsen had a reasonable prospect of recovering his stolen $194,000 by the end of 1987. Second and more fundamentally, Jeppsen claims that the tax court erred in concluding that by the end of 1987 Jeppsen had a reasonable prospect of recovering his stolen $194,000. We consider each of Jeppsen's claims in turn.

I.

We review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1). Thus, we review the Tax Court's "factual findings under the clearly erroneous standard and review its legal conclusions de novo." Anderson v. Commissioner, 62 F.3d 1266, 1270 (10th Cir. 1995). The question whether a court may consider events that transpired after the end of a tax year in order to determine whether, as of the end of that tax year, a taxpayer enjoyed a reasonable prospect of recovering stolen assets is a question of law which we review de novo.

Although this question appears to be one of first impression in this circuit, it was addressed by the Supreme Court in a case involving a predecessor statute of the current I.R.C. § 165. In United States v. S.S. White Dental Mfg. Co., 274 U.S. 398 (1927), the taxpayer, a Pennsylvania corporation engaged in the manufacture and sale of dental supplies, had organized a German subsidiary. In 1917, when the United States entered World War I, all assets of the German subsidiary were seized by the German government. Consequently, the taxpayer deducted the value of these assets from its 1918 taxes as an uncompensated loss. In 1924, following Germany's defeat in the War, the taxpayer was awarded partial restitution for its seized losses by the Mixed Claims Commission. Shortly thereafter, although no restitution had yet been paid, the IRS disallowed the taxpayer's 1918 deduction on the grounds that the loss of the German subsidiary had not been a "closed and completed transaction" in 1918, as evidenced by the 1924 restitution award. Id. at 399-400.

The Supreme Court agreed with the taxpayer's reading of the statute. As the Court explained:

> a loss may be complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment. It would require a high degree of optimism to discern in the seizure of enemy property by the German government in 1918 more than a remote hope of ultimate salvage from the wreck of the war. The Taxing Act does not require the taxpayer to be an incorrigible optimist.

Id. at 402-03.

By rejecting the I.R.S.'s exclusive reliance on events which transpired after 1918 as a basis for disallowing the taxpayer's 1918 theft loss deduction, the S.S. White Dental Mfg. Co. court established that a taxpayer's ultimate recovery does not *control* whether, at the end of a taxable year, that taxpayer enjoyed a reasonable prospect of recovering property stolen during that taxable year. However, S.S. White Dental Mfg. Co. did not address the issue of whether the IRS or a court may *consider* a taxpayer's ultimate recovery as one factor in its assessment of the reasonableness of the taxpayer's *ab initio* prospect of recovery.

In perhaps the only case from any court to address this distinction directly, the tax court held that ultimate recovery is irrelevant if it was not reasonably foreseeable by the end of the pertinent tax year. The court said:

> this Court must determine what was a "reasonable expectation" *as of the close of the taxable year for which the deduction is claimed*. The situation is not be viewed through the eyes of the "incorrigible optimist," and hence, claims for recovery whose potential for success are remote or nebulous will not demand a postponement of the deduction. *The standard is to be applied by foresight, and hence, we do not look at facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular year.* Nor does the fact of a future settlement or favorable judicial action on the claim control our determination, if we find that as of the close of the particular year, no reasonable prospect of recovery existed.

Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811-12 (1974), aff'd, 521 F.2d 786 (4th Cir. 1975) (internal citations omitted and emphasis added). Accord

-13-

Rainbow Inn, Inc., 433 F.2d at 644 ("The test is whether there was a reasonable prospect of recovery at the time the deduction was claimed, not later."); see also Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982) (taking into consideration a lawsuit filed *after* the close of the tax year in which a theft loss deduction was claimed, where it was reasonably foreseeable during the tax year at issue that a lawsuit would later be filed).

Both parties to the present case agree with the court's statement of the controlling legal principles in Ramsay Scarlett, although they disagree regarding the application of those principles to the present facts. We also agree with the court's observation in Ramsay Scarlett that determination of a reasonable prospect of recovery is a question of foresight. See also Parmelee Transportation Co. v. United States, 351 F.2d 619, 628 (Ct. Cl. 1965) (the court must assess if a reasonable person would have entertained a reasonable chance of recovery during the year of the discovered loss). Therefore, in accord with the Ramsay Scarlett decision, we hold that neither the IRS nor the tax court may consider in this context facts not reasonably foreseeable as of the close of the pertinent tax year.

Nonetheless, we reject Jeppsen's claim that in the present case the tax court improperly considered evidence of Jeppsen's ultimate recovery. We agree with Jeppsen that evidence of a recovery in 1995 should not have influenced the tax court's ultimate finding regarding the reasonableness, as of December 31, 1987,

-14-

of Jeppsen's prospect of recovery. We note, however, that the tax court expressly stated that its finding was *not* influenced by its receipt of such evidence. Indeed, in its July, 24, 1995 Order denying Jeppsen's Motion to Strike, the tax court expressly stated that it had sought information regarding the current status of Jeppsen's lawsuits against PJ & H, Barker, and Larkin, *not* for any purpose related to the court's decision making process, but rather "solely for purposes of completeness." In the same Order, the tax court also noted that "the terms of the [final] settlement of the lawsuit . . . were not disclosed to the Court and . . . the confidentiality of the settlement was not breached." (Aplt.'s App. at 78.) Thus, although the tax court was privy to the details of the arbitration panel's award to Jeppsen, it never learned how much money Jeppsen actually accepted in order to settle the defendants' appeal to this court.

Two days after denying Jeppsen's Motion to Strike, the tax court issued its Memorandum Opinion in the present case. Jeppsen v. Commissioner, 70 T.C.M. (CCH) 199, T.C.M. (P-H) ¶ 95,342 (1995), T.C. Mem. No. 1995-342. In its "FINDINGS OF FACT," the Memorandum Opinion noted: (1) the terms of the arbitration panel's award to Jeppsen; (2) the fact that the award had been appealed to this court; and (3) the fact that "[b]efore the Tenth Circuit rendered a decision on the appeal, the parties apparently entered into a confidential settlement of the dispute." Id. at 201. In analyzing Jeppsen's substantive claim,

-15-

however, the Memorandum Opinion nowhere relied on the fact of Jeppsen's ultimate recovery.  See id. at 201-02.

We agree with the tax court that a statement of the ultimate disposition of Jeppsen's suits against PJ & H, Barker, and Larkin is helpful to the reader in understanding the facts of the case, and thus contributes to the "completeness" of that court's written Memorandum Opinion.[4]  Several courts, including the Ramsay Scarlett court itself, have noted the ultimate disposition of the taxpayer's claims for recovery even while discounting the relevance of that fact to the court's ultimate decision.  See, e.g. Ramsay Scarlett, 61 T.C. at 805-06, 811-12 (noting that taxpayer obtained partial recovery in 1969 of money embezzled in 1965, but finding that taxpayer had no reasonable prospect of recovery in 1965);  Rainbow Inn, Inc. v. Commissioner, 433 F.2d 640, 642 (3d Cir. 1970) (finding no reasonable prospect of recovering money embezzled in 1962, even though taxpayer obtained restitution judgment in 1963, where judgment was based on erroneous legal theory and was reversed in 1964).  Accordingly, we decline Jeppsen's invitation to read any impropriety into the tax court's decision to note in its opinion, solely for the sake of completeness, the final disposition of Jeppsen's recently-decided lawsuits against PJ &H, Barker, and Larkin.

---

[4]Indeed, we have included a statement regarding Jeppsen's successful recovery in the "BACKGROUND" section of the present opinion.

II.

We now consider the central issue in the case: whether the tax court erred in its determination that, as of Dec. 31, 1987, Jeppsen had a reasonable prospect of recovering his stolen $194,000. Pursuant to I.R.C. § 7482(a)(1) and Fed. R. Civ. P. 52(a), we review the tax court's factual findings under the "clearly erroneous" standard. Anderson v. Commissioner, 62 F.3d 1266, 1270 (10th Cir. 1995). We review the tax court's legal conclusions de novo. Id.

We review mixed questions of law and fact either under the clearly erroneous standard or de novo, depending on whether the mixed question is primarily factual or legal. Id. Where, as here, the sole issue is whether the facts satisfied the statutory standard, we ordinarily would be inclined to review the Tax Court's application of the law to the facts de novo. First Nat'l Bank v. Commissioner, 921 F.2d 1081, 1086 (10th Cir.1990) (tax court findings of "ultimate fact" derived from applying legal principles to subsidiary facts are subject to de novo review).

However, Treas. Reg. § 1.165-1(d)(2)(i) provides that "[w]hether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances." This regulation was promulgated pursuant to the Secretary of the Treasury's express authority to "prescribe all needful rules and regulations

-17-

for the enforcement of" the Internal Revenue Code. I.R.C. § 7805(a). It appears to reflect the longstanding maxim that losses claimed under I.R.C. § 165 are to be allowed or disallowed in accordance with practical or realistic considerations. See Estate of Scofield v. Commissioner, 266 F.2d 154, 160 (6th Cir. 1959) (citing cases).

This court has long held that "a regulation promulgated by an administrative agency charged with the administration of an Act has the force and effect of law if it is reasonably related to administrative enforcement and does not contravene statutory provisions." Joudeh v. United States, 783 F.2d 176, 180-81 (10th Cir. 1986); see also In re LMS Holding Co., 50 F.3d 1526, 1528 (10th Cir. 1995) (holding certain treasury regulations to have "the force and effect of law"). With regard to treasury regulations promulgated by the Secretary of the Treasury, the Supreme Court has specifically held that "[b]ecause Congress has delegated . . . the power to promulgate 'all needful rules and regulations for the enforcement of [the Internal Revenue Code],' we must defer to [the Secretary's] regulatory interpretations of the Code so long as they are reasonable." Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 560-61 (1991).

Even more pertinent to the case at bar, the Supreme Court has long held that "'[t]reasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to

-18-

have received congressional approval and have the effect of law.'" Cottage Sav. Ass'n, 499 U.S. at 561 (quoting United States v. Correll, 389 U.S. 299, 305-06 (1967) ). We note that Treas. Reg. § 1.165-1(d)(2)(i) has not been amended since 1977, and that I.R.C. § 165 (which Treas. Reg. § 1.165-1(d)(2)(i) interprets and implements) was substantially reenacted when the entire Internal Revenue Code was otherwise revised pursuant to the Tax Reform Act of 1986. We cannot conclude that Treas. Reg. § 1.165-1(d)(2)(i) is an unreasonable interpretation of I.R.C. § 165. We therefore think that Supreme Court precedent requires us to deem Treas. Reg. § 1.165-1(d)(2)(i) to have received congressional approval and therefore to have the effect of law.

Consequently, we conclude that "[w]hether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact. . . ." Treas. Reg. § 1.165-1(d)(2)(i). Accordingly, we review the district court's findings in that regard under the "clearly erroneous" standard.[5] Ramsay Scarlett & Co. v. Commissioner, 521 F.2d 786, 788 (4th Cir. 1975) ( tax court's determination of the reasonable foreseeability of a taxpayer's recovery of a loss reviewable under the "clearly erroneous" standard).

---

[5]A finding is "clearly erroneous" when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

In conducting our review, we note that Jeppsen bears the burden of proving his entitlement to the theft loss deduction.  See Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943) ("[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer."). See also Parmelee Trans. Co., 351 F.2d at 628 (observing that taxpayer carries the burden of proving "no reasonable prospect" of recovery of the loss).   We also note that Jeppsen's burden is high: he must prove that it could  have been ascertained with  reasonable certainty as of December 31, 1987 that this loss would never be recovered.  See Treas. Reg. § 1.165-1(d)(3) ("[N]o portion of the loss with respect to which reimbursement may be received is sustained, for purposes of [I.R.C.] section 165, until the taxable year in which *it can be ascertained with reasonable certainty* whether or not such reimbursement will be received.") (emphasis added).  Thus, if Jeppsen's prospect of recovery was simply unknowable as of  December 31, 1987, then Jeppsen would not be entitled to take the theft loss deduction in 1987.

"A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor."  Ramsay Scarlett, 61 T.C. at 811 (citations omitted). Even a small chance of success might make the pursuit of legal remedies objectively reasonable, especially when the

-20-

stakes are high. "A lawsuit might well be justified by a 10% chance [of success]."

Parmelee Transp. Co. , 351 F.2d at 628.  Accord Rainbow Inn, Inc. , 433 F.2d at

644; Exxon Corp. v. United States, 7 Cl. Ct. 347, 355 (1985), rev'd on other

grounds, 785 F.2d 277 (Fed. Cir. 1986), vacated after remand, 840 F.2d 916 (Fed.

Cir. 1988), and aff'd after subsequent remand, 931 F.2d 874 (Fed. Cir. 1991).

The "reasonableness" of a taxpayer's prospect of recovery is primarily

tested objectively, although a court may consider to a limited extent evidence of

the taxpayer's subjective contemporaneous assessment of his own prospect of

recovery.  Ramsay Scarlett, 521 F.2d at 788 (citing Boehm v. Commissioner, 326

U.S. 287, 292-93 (1945)).  As the Boehm Court explained,  "[t]he taxpayer's

attitude and conduct are not to be ignored, but to codify them as the decisive

factor in every case is to surround the clear language of . . . [the applicable

statute] with an atmosphere of unreality and to impose grave obstacles to efficient

tax administration."[6]  Boehm, 326 U.S. at 293.

Under Treas. Reg. § 1.165-1(d)(2)(i), a taxpayer's prospects of recovery

"may be ascertained with reasonable certainty, for example, by a settlement of the

claim, by an adjudication of the claim, or by an abandonment of the claim."

---

[6]Boehm did not involve the theft loss deduction at issue here, but rather a deduction available to holders of corporate stock that becomes worthless. However, the Fourth Circuit in Ramsay Scarlett analogized to Boehm in a very similar context, and we agree that the analogy is apt.

Courts have occasionally suggested that the fact that a taxpayer *files* a lawsuit may give rise to an inference that the taxpayer has a reasonable probability of recovering his loss. See Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982) (applying such an inference); Estate of Scofield v. Commissioner, 266 F.2d 154, 159 (6th Cir. 1959) (filing lawsuit may give rise to inference of reasonable probability of recovery unless the lawsuit appears to have been specious, speculative, or wholly without merit); Parmelee Transp. Co., 351 F.2d at 629 ("[A] suit by a taxpayer will not operate as a presumption; at the most it leads to an inference which leads to an evaluation of the probabilities."). Several courts drawing an inference of "reasonable prospect of recovery" from the fact that the taxpayer has filed a lawsuit have been willing to consider lawsuits filed after the end of the tax year for which the theft loss deduction was claimed, so long as the taxpayer *contemplated* filing the lawsuit during that tax year. See Ramsay Scarlett, 61 T.C. at 812 (noting that taxpayer's retaining a lawyer and generally acting as though "gearing up for a contest" to vindicate legal rights during the year of the discovered loss may be evidence of reasonable certainty of recovery even though suit not formally filed until following tax year). See also Dawn, 675 F.2d at 1078-79 (citing cases).

We agree that the fact that a taxpayer, in a given tax year, contemplates filing a suit to recover his losses may be considered in the mix of evaluating

whether the taxpayer has a reasonable prospect of recovery. However, like any other subjective factor, this inference should not control the outcome of the case. See Boehm, 326 U.S. at 292-93. As noted earlier, the primary analysis of whether there is a reasonable prospect of recovery on a claim for reimbursement of loss is an objective one.

With these principles in mind, we review the tax court's determination in the present case. In support of its position that Jeppsen was not entitled to a theft loss deduction in tax year 1987 for the losses he suffered that year at the hands of stockbroker Barker, the tax court found that, by the end of 1987: (1) Barker had engaged in conduct that was both illegal and actionable; (2) Jeppsen knew what Barker had done; (3) Jeppsen began shopping for lawyers immediately and never at any time ceased attempting to recover his money; (4) Barker's former employers PJ & H and E.F. Hutton were proper co-defendants, both of whom had more than sufficient assets available to satisfy any judgment awards against them; and (5) Jeppsen filed suit in March, 1988, several months before he filed his 1987 tax return.

As Jeppsen points out, several countervailing facts indicate that Jeppsen's prospects of recovery were never, until he prevailed, 100 percent. In particular, Jeppsen notes that: (1) both PJ & H and E.F. Hutton consistently disclaimed any liability; (2) no lawyer contacted by Jeppsen would take his case on a contingency

basis; and (3) several lawyers--including the firm he eventually retained--told Jeppsen that the case would be lengthy and expensive to pursue, with no guarantee of winning. Jeppsen asserts that these factors in the aggregate might have discouraged a reasonable person from bringing even a meritorious suit.

We appreciate the substantial risk that Jeppsen faced, and the significant effort that was required in order for Jeppsen to recover his stolen money. Indeed, faced with such obstacles, Jeppsen might reasonably have had decided to abandon his claims against Barker *et al*. in 1987. However, Jeppsen did *not* abandon his claims, in 1987 or ever. Rather, he sought in 1987 to determine whether and how he could recover his lost $194,000, and then steadfastly pursued all available legal remedies. Further, his suit was not based on a meritless legal theory, compare Rainbow Inn, Inc., 433 F.2d at 643-44, nor did his ultimate recovery depend on the outcome of some unforeseeable intervening event, compare S.S. White Dental Mfg. Co., 274 U.S. at 403 (taxpayer not required to predict American victory in World War I and subsequent establishment of Mixed Claims Commission to award war reparations). Jeppsen's decision to pursue his stolen $194,000 before "writing it off" as lost was not an objectively unreasonable decision, even in the face of advice to the contrary from more than one lawyer. See Ramsay Scarlett, 61 T.C. at 795. Given the facts of this case, including the amount of money at stake, the assets available to the co-defendants, and the

possibility of obtaining some form of legal restitution, it could not be ascertained with reasonable certainty in 1987 that reimbursement for Jeppsen's losses would never be obtained. Yet such reasonable certainty is required by Treasury Regulation § 1.165-(d)(3) in order for a taxpayer to be allowed to deduct a theft loss from taxable income.

Accordingly, we cannot say that the tax court clearly erred in sustaining the IRS's disallowance of Jeppsen's claimed 1987 theft loss deduction. The judgment of the tax court is therefore AFFIRMED.

No. 96-9002, Harv L. Jeppsen v. Commissioner of Internal Revenue.

KELLY, Circuit Judge, dissenting.

A.

The court places an insurmountable barrier on the taxpayer by requiring that he must prove with reasonable certainty, as of the end of the tax year, that the loss would never be recovered. Ct. Op. at 20, 25. According to the court, if the prospect of recovery is unknowable, then the taxpayer is not entitled to a deduction. Id. at 21.

The "closed transaction doctrine," on which the court relies, does not require proof that the loss will never be recovered. Rather, it merely requires that reasonable prospects of recovery must be exhausted before a transaction will be considered closed and completed. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 807 (1974), aff'd, 521 F.2d 786 (4th Cir. 1975). A reasonable prospect of recovery exists "when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. Id. at 811. Though the taxpayer had bona fide claims, as of December 1987, as discussed below a "substantial possibility" did not exist that the claims would be decided in his favor. The regulation cited by the court, Treas. Reg. § 1.165-1(d)(3), merely provides that "if . . . there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement

may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received." Thus, the taxpayer need only prove that it is reasonably certain that reimbursement will not be received; there is no requirement of proof that the loss will never be recovered. <u>See</u> <u>United States v.</u> <u>S.S. White Dental Mfg. Co.</u>, 274 U.S. 398, 402-03 (1927) ("a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of eventual recoupment").

B.

"Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances." Treas. Reg. § 1.165-1(d)(2)(i). The Tax Court's finding in this case is reviewed under the "clearly erroneous" standard; "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>United States v. United</u> <u>States Gypsum Co.</u>, 333 U.S. 364, 395 (1948). I am convinced that a mistake was committed when the Tax Court rejected the taxpayer's substantial and uncontroverted proof that, at the end of 1987, he lacked a reasonable prospect of

later recovering his loss.  See Rainbow Inn, Inc. v. Commissioner, 433 F.2d 640, 644 (3d Cir. 1970) (reversing Tax Court's determination that a reasonable prospect of recovery existed).

Several well-established principles guide review.  In determining whether a reasonable prospect of recovery exists, the relevant facts and circumstances are those that are known or reasonably could been known as of the end of the tax year for which the loss deduction is claimed.  See Halliburton Co. v. Commissioner, 946 F.2d 395, 400 (5th Cir. 1991).  "The only fair test is foresight, not hindsight." Scofield's Estate v. Commissioner, 266 F.2d 154, 163 (6th Cir. 1959) (Tax Court's findings were clearly erroneous because factual conclusions and inferences drawn from the facts were based upon hindsight).  Both objective and subjective factors may be examined.  Boehm v. Commissioner, 326 U.S. 287, 292 (1945); Ramsay Scarlett & Co. v. Commissioner, 521 F.2d 786, 788 (4th Cir. 1975).

One of the facts and circumstances deserving of consideration is the probability of success on the merits of any claim brought by the taxpayer.  While it is true that the filing of a lawsuit may give rise to an inference of a reasonable prospect of recovery, Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), the inference is not conclusive nor mandatory.  Merely because a lawsuit with a ten percent chance of recovery might be justified on grounds of principle

does not mean that the lawsuit provides "a reasonable prospect of recovery." "The inquiry should be directed to the probability of recovery as opposed to the mere possibility." Parmelee Transp. Co. v. United States, 351 F.2d 619, 628 (Ct. Cl. 1965). A "remote possibility" of recovery is not enough; there must be "a reasonable prospect of recovery at the time the deduction was claimed, not later." Rainbow Inn, 433 F.2d at 644.

Surely a "reasonable prospect of recovery" encompasses an assessment of litigation risk at the time the deduction is claimed; given the uncertainty of trial and proof, there is a world of difference between pleading a claim, proving it and bringing it to judgment. Moreover, the obvious defenses to a claim cannot be ignored, nor can the financial capacity of a defendant to vigorously contest liability. At the Tax Court trial, the only testimony about the mechanics of the taxpayer's claim and the defenses raised was the attorney who prosecuted the claim, an expert in the field of securities litigation. No persuasive reason exists for disregarding his testimony. See Ramsay Scarlett, 521 F.2d at 789 (Widener, J., concurring) ("The opinion of Sykes, admittedly a skillfull attorney, as to the merits of the taxpayers' claims against the bank, was obviously relevant in any kind of objective inquiry."). Although the government, with 20-20 hindsight, suggests various theories of liability that should have been apparent in 1987, most of the telling facts were developed later and the difficulty of successful proof on

-4-

controverted facts makes the outcome far less apparent.  See, e.g., Hotmar v. Lowell H. Listrom & Co., 808 F.2d 1384, 1385 (10th Cir. 1987) (directed verdict in favor of defendants on churning claim).

Here, despite the taxpayer's belief that he had been wronged, virtually no evidence existed to substantiate the taxpayer's claims as of December 31, 1987. From a procedural perspective, the taxpayer had signed an account agreement with PJ & H that contained an arbitration clause that would limit discovery, so it was necessary to mount an attack on the validity of the arbitration clause in federal court (an attack that would ultimately prove unsuccessful), in part to obtain the liberal discovery allowed by the federal rules.  The scope of discovery that was ultimately allowed in federal court greatly benefitted the taxpayer, but that scope was fortuitous.

The merits of the case depended not only upon credibility, but also a determination of whether PJ & H could be responsible for the activities of its broker.  PJ & H denied liability and responsibility for its broker, despite an admission by the branch manager that the unauthorized discretionary trading was improper.  The parties have stipulated that the broker's actions constituted theft under Utah law, and only if taxpayer could prove that the broker's conduct was in the course and scope of his employment would there be vicarious liability based upon respondeat superior.  See Jackson v. Righter, 891 P.2d 1387, 1391 (Utah

-5-

1995); Birkner v. Salt Lake County, 771 P.2d 1053, 1056-59 (Utah 1989).

Several courts have held that employee theft is not within the course and scope of employment, see, e.g., Los Ranchitos v. Tierra Grande, Inc., 861 P.2d 263, 268 (N.M. App. 1993); B.B. Walker Co. v. Burns Int'l Security Servs., 424 S.E.2d 172, 174 (N.C. App.), review denied, 429 S.E. 2d 552 (N.C. 1993); but see Richards v. Attorneys' Title Guaranty Fund, Inc., 866 F.2d 1570, 1572-73 (10th Cir.) (applying Restatement (Second) of Agency § 261 (1958); vicarious liability for agent's theft), cert. denied, 491 U.S. 906 (1989), and the Utah courts have recognized that the issue may be decided as a matter of law when the employee's conduct is so clearly outside the scope of employment that reasonable minds could not differ, see Jackson, 891 P.2d at 1391; Birkner, 771 P.2d at 1057. Given the parties stipulation of theft, the taxpayer had a formidable legal barrier to overcome.

As of December 1987, PJ & H also could be expected to defend on the basis that (1) the taxpayer was a sophisticated, aggressive investor who authorized the transactions and sought return without regard for risk, (2) the taxpayer had received confirmations and account statements and therefore had ratified the transactions, and (3) the taxpayer was merely trying to avoid the consequences of the 1987 market fall. I am persuaded that all of these objective factors viewed as of December 1987, together with the taxpayer's statement on cross-examination

that he pursued the matter as a moral issue, despite advice that his chances were not very good, Aplt. App. at 155, render the Tax Court's finding clearly erroneous.

I would reverse and therefore respectfully dissent.