T.C. Memo. 2019-39

UNITED STATES TAX COURT

DONNOVAN M. McNELY AND BETTY J. CRUZ-McNELY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30415-15.                         Filed April 18, 2019.

<u>Cindy L. Ho</u>, for petitioners.

<u>Cameron W. Carr</u> and <u>Thomas R. Mackinson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  Respondent determined a deficiency in petitioners' 2011

Federal income tax, a late filing addition to tax under section 6651(a)(1),[1] and an

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

**[\*2]** accuracy-related penalty under section 6662(a) of $133,779, $37,323, and $26,755, respectively.

After stipulations,[2] the issue before the Court is whether petitioners are entitled to deduct theft losses passed through M & M Properties, Inc. (M & M), totaling $418,283 for their tax year 2011.[3]

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference. Petitioners resided in California when they timely filed the petition.

---

[2]The parties have stipulated: (1) an adjustment of $10,956 to income for gambling losses claimed as other miscellaneous deductions on Schedule A, Itemized Deductions; (2) liability for the sec. 6651(a)(1) late filing addition to tax; and (3) liability for the sec. 6662(a) accuracy-related penalty. Further, we note that the record contains evidence, in the form of a civil penalty approval form, that respondent complied with the requirements of sec. 6751(b)(1). See Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).

[3]In the notice of deficiency, respondent disallowed any deduction for the theft loss. Respondent has conceded that the S corporation described below incurred a theft loss but argues that petitioners were not entitled to deduct any of that loss for 2011 for lack of proof that the loss was incurred during that year. The only year before this Court is 2011. Additionally, we find the record lacks facts sufficient to enable us to consider the implications of the theft loss for years outside 2011 with respect to our redetermination of the deficiency properly before this Court. See Hill v. Commissioner, 95 T.C. 437, 439-440 (1990). Accordingly, our jurisdiction over this loss extends only to the claim made on petitioners' 2011 tax return.

**[*3]** I.    M & M Properties, Inc.

Petitioner Donnovan McNely and Jeffery McKay incorporated M & M on October 23, 2008, as 50% shareholders. M & M was an S corporation at all relevant times. M & M was involved in the real estate business in northern California exclusively until Mr. McKay's cousin, Justin Sinnott, presented M & M with an investment opportunity in southern California.

Mr. Sinnott's proposed opportunity to M & M involved M & M's purchasing distressed real estate properties which had immediate renters who could not qualify for loans to purchase the homes. This would create immediate rental income for M & M before it later sold the property to the renter for a premium. The purchases would take place through First Investments, JoCal Investments, Eternity Escrow, and Salem Abbadi. (We will refer to the actors and the proposed opportunity collectively as the fraud scheme.) The truth behind the opportunity was a complex real estate fraud transaction which, generally, faked a short sale of property to a cash buyer (e.g., M & M) and issued a grant deed to the cash buyer (e.g., M & M). No one paid the bank holding the note on the property. Thus, after the bank foreclosed on the property, the cash buyer (e.g., M & M) would no longer have ownership of the property. In some transactions the fraud

**[*4]** scheme would use real title companies which had title insurance, but in other transactions they would use fake title companies created under the fraud scheme.

Between 2008 and 2011, M & M purchased between 14 and 16 properties. While the record is unclear on how many of these properties were purchased as part of the fraud scheme, at least six properties (six Southern California properties) were subject to the fraud scheme.

II.     The Six Southern California Properties

Between January 28 and November 30, 2010, M & M acquired the six Southern California properties. Of the six Southern California properties, at least four used real title companies.

A.     M & M's Fraud Suspicion

Mr. McKay acted as the point of contact, both through Mr. Sinnott and directly, for M & M's dealings with the fraud scheme. On February 24, 2011, Mr. McKay learned of the possible issues with M & M's real estate investments concerning the six Southern California properties through an email from Mr. Sinnott. In approximately May 2011, Mr. McKay drove to southern California to speak with members of the fraud scheme but was unable to find anyone associated with it. After the May trip but at a time not in the record, Mr. McKay spoke with a member of the fraud scheme and attempted to recoup some of M & M's

[*5] investment by fabricating a story involving a rich aunt who was seeking to invest in commercial real estate the fraud scheme owned. Mr. McKay told the fraud scheme that his aunt would invest only after M & M had received some of its investment back. Mr. McKay's attempt to scam the fraud scheme did not work, and M & M did not receive any money from the fraud scheme at any time.

Subsequently, at a time not in the record, but in 2011 after concern arose with M & M's potential loss on the six Southern California properties, Mr. McKay spoke briefly with a fellow country club member, an attorney named Richard Struck, about the fraud scheme. After their conversation at the country club, Mr. McKay had a one-hour meeting with Mr. Struck at his office. In that meeting Mr. McKay described his dealings with the fraud scheme but did not provide any documentation. Mr. Struck, who was not retained, advised Mr. McKay that the best recourse would be restitution after litigation. Neither Mr. McNely, Mr. McKay, nor M & M filed a lawsuit.

B.     Police Investigation

Investigator Donald Willie, with the Orange County district attorney's office, became involved in the investigation of the fraud scheme in 2012.[4] On

---

[4]On May 9, 2013, Investigator Willie contacted the Federal Bureau of Investigation (FBI) for their notes when he began his investigation. The FBI had

(continued...)

[*6] February 25, 2015, Investigator Willie conducted his only interview with M & M, speaking with Mr. McKay, to gather information related to M & M's investments in the fraud scheme. During the interview Mr. McKay asked whether there was a chance M & M would recover any of its investment, to which Investigator Willie answered that it was highly unlikely. Other parties had recovered some or all of their investments through title insurance as some of the title companies used by the fraud scheme were legitimate. Neither Mr. McNely, Mr. McKay, nor M & M filed title insurance claims.

III.    Petitioners' 2011 Tax Return

Petitioners untimely filed their Form 1040, U.S. Individual Income Tax Return, for the tax year 2011, claiming a $407,327 Schedule A deduction under section 165 for a theft loss related to the six Southern California properties. M & M's return, filed on September 6, 2012, did not report the theft losses.[5]

---

[4](...continued) been investigating the fraud scheme for two years but never spoke to Mr. McNely or Mr. McKay. The first criminal indictments were filed in 2014.

[5]The Court is unclear as to why petitioners believed they were entitled to a deduction for a theft loss when M & M did not claim a theft loss deduction on its 2011 return.

**[*7]**                                      OPINION

I.     Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace. Deputy v. du Pont, 308 U.S. 488, 493 (1940). Taxpayers must comply with specific requirements for any deductions claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

II.    Section 165 Theft Loss

Section 165 generally permits taxpayers to deduct against their ordinary income the amount of any uncompensated loss resulting from theft for the year in which the taxpayer discovers that loss. See sec. 165(a), (c), (e). To qualify for a theft loss deduction, taxpayers must prove: (1) the occurrence of a theft, (2) the amount of the theft loss, and (3) the year in which the taxpayers discover the theft loss. Id.

A taxpayer may deduct a theft loss for the year in which the loss is sustained. Sec. 165(a). Any loss arising from theft is treated as sustained during the taxable year in which the taxpayer discovers the loss and in which the loss is

**[\*8]** evidenced by a "closed and completed" transaction. Sec. 165(e); sec. 1.165-1(d)(1), Income Tax Regs. Whether there is a closed and completed transaction with respect to a theft loss depends on the taxpayer's prospect of recovering the loss. Sec. 1.165-1(d)(2)(i), Income Tax Regs. Whether there is a reasonable prospect of recovery is a question of fact that must be determined by examining all facts and circumstances. Id.

The test for determining whether the taxpayer had a reasonable prospect of recovering a theft loss is primarily an objective test. See Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), aff'd, 521 F.2d 786 (4th Cir. 1975). However, the taxpayer's subjective belief as of the close of the year that there is a reasonable prospect of recovering the loss is also an important and relevant factor. See Boehm v. Commissioner, 326 U.S. 287, 292-293 (1945).[6] The burden of proof is on petitioners, and they must prove that it could have been ascertained with reasonable certainty as of December 31, 2011, that the loss would never be

---

[6]Boehm v. Commissioner, 326 U.S. 287 (1945), did not involve the theft loss deduction at issue here but rather a deduction available to holders of corporate stock that becomes worthless. However, the Court of Appeals for the Fourth Circuit in Ramsay Scarlett & Co. v. Commissioner, 521 F.2d 786 (4th Cir. 1975), aff'g 61 T.C. 795 (1974), analogized to Boehm in a very similar context, and we agree that the analogy is apt. Jeppsen v. Commissioner, 128 F.3d 1410, 1418 n.6 (10th Cir. 1997), aff'g T.C. Memo. 1995-342.

**[\*9]** recovered.[7] See Jeppsen v. Commissioner, 128 F.3d 1410 (10th Cir. 1997), aff'g T.C. Memo. 1995-342; sec. 1.165-1(d)(3), Income Tax Regs.  If in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to the which reimbursement may be received is sustained until the year in which it can be ascertained with reasonable certainty whether such reimbursement will be received.  Jeppsen v. Commissioner, 128 F.3d at 1414; see sec. 1.165-1(d)(3), Income Tax Regs.  Further, if the prospect of recovery was "simply unknowable" at the end of the tax year, then the taxpayer is not entitled to the theft loss deduction for that year.  See Vincentini v. Commissioner, 429 F. App'x 560, 564 (6th Cir. 2011) ("[S]peculation and conjecture will not support a taxpayer deduction under this provision[.]"), aff'g T.C. Memo. 2009-255, supplementing T.C. Memo. 2008-271.

III.    Actions

Mr. McNely personally did not speak with anyone from the fraud scheme, Mr. Struck, or Investigator Willie.  All communications were through his business

---

[7]The Court has jurisdiction in this proceeding to determine whether petitioners are entitled to deduct any theft loss incurred by M & M during 2011. See, e.g., Winter v. Commissioner, 135 T.C. 238 (2010); Powell v. Commissioner, T.C. Memo. 2016-111, at \*2 n.1, aff'd, 689 F. App'x 763 (4th Cir. 2017).

**[\*10]** partner, Mr. McKay.  Mr. McNely testified that in 2010 "we talked to an attorney" who advised that it would cost several hundred thousand dollars to fight the fraud scheme and that they would not recover their money.[8]  The evidence in the record fails to show that Mr. McNely personally spent any time, money, or effort to recover his loss.  A relevant factor is the amount of time and money spent by the taxpayer investigating and prosecuting the claim.  See Nat'l Home Prods., Inc. v. Commissioner, 71 T.C. 501, 526 (1979).

Because of the vagueness and inconsistences revealed in the record, the Court does not find Mr. McNely's testimony credible but does find the inconsistencies important in the Court's determination of the year in which the loss was sustained as compared to Mr. McNely's subjective belief.  Mr. McNely's uncorrobortaed and, in part, contradicted testimony shows he believed he had no reasonable prospect of recovery in 2010, not 2011, the year for which the theft loss deduction was claimed.  Mr. McNely testified that the fraud scheme led M & M to believe it had interests in the commercial real estate scam M & M had presented and that it took M & M five or six months to realize that it had completely lost its

---

[8]The Court has no evidence of Mr. McNely's speaking with an attorney other than his uncorroborated testimony.

[*11] investment in 2010 upon the fraud scheme's returning none of their investment.[9] He subsequently spoke with a lawyer and his accountant, who both informed him there was no prospect of recovery in 2010.[10] Further, he claims to have filed a police report in late 2010 but did not provide any evidence of this claim.

Mr. McNely testified that he did not file an insurance claim because he believed that all the titles were fake. However, Mr. McNely did not provide any evidence other than his testimony. The Court finds credible Investigator Willie's testimony that other victims did recover through title insurance claims. The Court finds that Mr. McNely had the opportunity to file a claim in 2011 with a prospect of recovery but chose not to.

---

[9]Mr. McNely testified that the conversation was probably in May or June 2010. This time line is contradicted by Mr. McKay's testimony and communication with Mr. Sinnott, and we decline to find the time line as fact.

[10]Mr. McNely testified that his accountant agreed and advised Mr. McNely that the best thing to do was to write it off on his tax return and consider it a loss. Mr. McNely filed his 2011 tax return untimely in 2014. The Court does not find it credible that Mr. McNely discussed the loss with and was advised by his accountant three years before filing his tax return. Further, while the date of his return was stipulated by the parties, Mr. McNely testified that he believed he did not file his 2011 tax return untimely, which contradicts the stipulation, and that he had hired people to complete his tax returns for him.

[*12] In 2011, the year for which the deduction was claimed, the only actions by M & M were an attempt to scam the fraud scheme and Mr. McKay's conversation with Mr. Struck. While M & M's attempt to scam the fraud scheme clearly shows it believed it might be possible to recover some of its investment, the meeting with Mr. Struck confirmed that: Mr. Struck advised that recovery might be possible through restitution. However, Mr. McNely and M & M failed to file a lawsuit seeking recovery.

Further, as late as 2015, when Mr. McKay, on behalf of M & M, was interviewed by Investigator Willie, he inquired about the prospect of recovery. This shows that M & M did not have a subjective belief that there was no reasonable prospect of recovery as late as 2015.

After reviewing both objective and subjective factors, the Court finds that M & M's prospect of recovery was simply unknowable and nothing more than speculation and conjecture at the end of 2011. By the end of 2011, M & M had not engaged an attorney, filed insurance claims, or made any effort to recoup any of the losses. Thus, it would have been impossible for M & M to conclude, when others had recovered and M & M had been advised of potential recovery options, there was no reasonable prospect of recovery.

**[*13]** We have considered all the other arguments made by the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.